Good morning, Your Honor. May it please the Court, Sven Brand Erickson for Electron Hydro and Mr. Tom Fisher. And Mr. Fisher is here in the courtroom with me today. There are three issues in this appeal. The District Court's holding that simply impeding fish passage is take under the Endangered Species Act is wrong as a matter of law. The District Court also wrongly picked between competing evidence at the summary judgment stage. And having found liability, the District Court abused its discretion in granting the expansive relief sought by the Tribe. I'd like to start with a remedy because the panel faces an immediate decision whether to stay the District Court's injunction. The motion panel deferred Electron's motion to stay the District Court's injunction order to this panel and expedited briefing so that we could have argument today. Absent action by this panel, construction could start as early as next week. Where we stand right now, we have all of the permits needed to do the work except for one. We have one agency that still has not signed off on the project. Once that's done, all approvals will be in place. The company is mobilized and prepared to proceed. So that's where we stand today. What does that actually look like? What will you be physically doing if the District Court's order holds? So the process, in essence what happens is constructing two cofferdams is the first step. A cofferdam upstream and downstream to block off where the spillway is. And then coming in from upstream, there's a little access road coming down and digging the sediment away from the upstream side of the spillway down to the rock, cutting off the steel, moving the rock, doing the work below the spillway, putting in basically an apron of rock below the spillway, and constructing the rock on the side on the left bank to stabilize that bank. And when that work is done, then removing the cofferdams. Let me ask you if we were to agree with you with respect to and it went back to the District Court, what is the timing implication of that? Because I know up to now you haven't had the permits to even go forward. Do they have an expiration date? What is the timeline for the construction? The timeline for this construction, there's an in-water work season, and the in-water work season is from July 15 to September 15. So basically we're right at the verge of the construction season. The two alternative remedies that we identified, both could be, that we presented to the District Court, both could be executed very quickly. One of them is simply removing gravel above on the right-hand side so that water flow returns back to the right-hand side of the structure, as was authorized by all of the agencies in 2021. The other is simply to construct a cofferdam. Do you need additional approvals for that now, or do you have that, could you do that work now if you were permitted? We need approvals for any work that we would do. And the other would be to construct a cofferdam and only construct the cofferdam to block off flow to the diversion. So you haven't quite answered my question, and that is, I want to understand the water construction season, but if you were to go back to the District Court because of a factual issue, and you have to have trial, and so then are we into next season? And would you need, the second part of my question then was, would you need new permits and would you have to start over on the permitting process? It depends on what is being proposed. If we were to do exactly the same thing, these permits would still be valid, they should be. But if you were to do your proposed alternative, you would need different permits. Yes, slightly different. Yeah, which is going back through a process with the agencies. So the issue is here that, and I would also note that we're talking about a temporary structure, and that in fact, at the same time, the company is pursuing permits for the permanent solution, and has put years of work into that process, and basically is, you know, has applications pending with the agencies to proceed with the permanent solution, which is to put a permanent spillway in this diversion structure. Now, your position is that we should send this back to District Court to resolve these factual issues? Applying the correct legal standard and resolve the factual issues. Is this something that folks should feel comfortable about having a jury decide? It is, well, you know, I don't know why a jury couldn't decide this issue. I mean, the issues are, you know, it's basically expert decision, you know, expert opinions as to what the effects of these structures are. I'd also note right now the case is scheduled to be heard by the judge, although we may request a jury. But I'd like to point out that this court has recognized injunctive relief must be tailored to remedy the specific harm alleged. Here, the District Court found that water flowing over the temporary spillway distracts fish from the functional fish ladder, which has been in for 20 years. Instead of directing Electron to take steps to address that flow of water, to either limit or remove that distraction, the court ordered Electron to create an entirely new pathway for fish passage through the spillway. Can you kind of maybe back you up a little bit to the to the disputes of fact? Can you walk through what you think are the genuine disputes of fact that require a trial as between the opinions of the two experts? Yes. Yeah. The issues are both direct and indirect harm to the fish. Whether or not there is, in fact, any direct harm to fish resulting from their encounters with this spillway, whether downstream migrants or upstream migrants are injured or killed directly. Whether the spillway impedes the safe passage of the fish. Yes. Your expert says no. Correct. Their expert says yes. Yes. And then secondarily, whether even if the fish are not directly injured or killed by their encounter with the spillway, whether they are so distracted by water flow over the spillway that they don't find their way to the fish ladder. That was the sort of secondary thing your expert said. Yes. They could find their way. Yes. He said, based on what I have seen, they can find their way and fish that try to go over the spillway would be washed down in front over to the left and would find their way. And in fact, they observed fish going through the fish ladder. But so Dr. Barrett says, OK, the fish can go to the fish ladder. Yes. In layman's terms. But the tribe shows that that fish ladder is not always accessible. That's not disputed, right? There are. Because of lack of water. All right. There are. Yes or no? Is that disputed? I'd say a current. I'd say not for any length of time. It does happen periodically, but not for any material length of time. I'd There's a range of flows that it was designed for. And when flows are within that range, then it's going to function. It does have to be maintained. But there's a lack of water, then there's an issue. And so the question is that during those periods when the fish can't get over there and there's a water problem, is there a significant impairment at least during that time frame? The first of all, recognize that this is still a temporary situation. And that those issues are best addressed through the long term design and structure for this. Well, that might be, but we're not we're not there. We're here. So here and now, what's the answer to my question? If there is, you know, a very low flow is a time period where the can't move up the river, the same thing would be true at other stages, other parts of the river. There are other places in the river where very low flows are going to make it very difficult for the fish to move up the river. That's there's a highly, you know, it's a highly variable flow in this river. And that happens. Fish move up the river with the rains, they move up with the flow when the flows are higher. I want to move to the legal standard applicable here. Before you do that, I think back to Judge Hawkins' question about what are the key factual issues? Is it just is it primarily the dispute between the experts? All of the testimony, basically, the evidence presented at summary judgment was expert expert declarations. So yes, it's basically a dispute between the experts. And that the court chose between the experts and decided that it preferred the perspective of the tribe's experts. And right now, it's a bench trial. Yes. You didn't request to make a demand for jury trial earlier in the proceeding. That is correct. That is correct. Well, I might revisit that based on the judge's rules. Well, it'll be interesting to see whether he allows you to do that. Whether that would be permitted at this stage. I understand that. But that's kind of getting ahead of the game. One of our primary concerns about this case, the remedy that has been ordered by the court obviously is very important to us. The fact that the judge has ordered us to open up a new channel through the spillway instead of making the fish ladder work better has profound effects. And that, in essence, we are going to be launched down that path within a few weeks. But we're also very concerned about the legal standard that the court applied here. The terms impede or distract are both vague. They encompass a wide range of impacts. Saying that an impediment disrupts normal behavior does not tell us how much impact it actually had on the fish. When it defined harm, National Marine Fisheries Service recognized that there had to be a causal link between the disruption and injury or death to listed species. This court in Bernal also recognized that habitat modification does not constitute harm unless it is actually connected to death or injury to wildlife. National Marine Fisheries Service and this court followed the Supreme Court's recognition in Sweet Home that every term of the definition of harm is subservient to the phrase and act which actually kills or endangers wildlife. That piece of the legal standard is missing from the district court's analysis. If you look at the district court's decision... How do you...we have cases, you know, that says that say habitat modification which significantly impairs the breeding and sheltering of a protected species amounts to harm under the ESA. So, do you disagree with that statement of law or... You have to look at what the nature of the harm is that was identified as actually take. So, for example, in the marbled murrelet cases, you have cases where removing trees, a significant amount of trees of habitat from an area with known marbled murrelet population was identified as take because it would have an impact on the ability of a known population to breed. In a spotted owl case you have, which we cited, Audubon case, you have an injunction was denied because while there was evidence of impact on habitat, there was no evidence that that would cause there to be insufficient habitat available for breeding. Right. So, I mean, isn't...I guess the question hearing this, whether the dispute we're discussing is more factual than legal because I think we could all agree there'd be ways you could build a brick wall over the river and nobody could get up it and we would know that that is causing harm. But the court has to recognize what the bar is that it is applying. What's the standard that it is applying to the evidence that was presented? And the district court applied a low bar, a low level of impediment. It did not require evidence that there was actually an impact on the ability of fish to spawn. If it had made a determination based upon that, then it would have...it could only get to that place by accepting, you know, by going with the tribe on the disputed issues of fact. Because there was clear evidence that if there was an impediment, it was not preventing fish from getting up the river. So, I also want to touch briefly on mootness. And I am going to try to reserve about four minutes for rebuttal. We've asked you to stay the district court's order. And this is an appeal from an injunction order. And so I expect an argument that if you don't grant a stay, that this is a moot appeal. Even in the absence of a stay, this appeal remains a live controversy. The question is not whether the precise relief sought at the time of the appeal filed is still available. The question is whether there can still be any effective relief. And the tribe filed a contempt motion against Electron shortly within a month after the injunction was issued, asking the district court to find that Electron is not complying with the injunction order. That motion has been continued. It's actually set for hearing next Tuesday. Although, talking to the council, it may be put off to see, it may actually be dismissed and we'll see if a new motion is filed. But until the spillway project is completed, Electron is at risk of renewed claims of deficiencies from the tribe. Even after the spillway project is completed, the tribe has reserved the right to claim the diversion is still taking ESA listed fish even after the channel through the spillway is open. Having the wrong ESA standard as law of the case puts Electron at risk of further injunction orders. So that is why, regardless of whether or not the court issues a stay in the next week, this case will not be mooted by that decision. It remains a live controversy. I don't want to cut much into your rebuttal, Tom, but I want to precisely understand where you think the district court went wrong because the district court did not apply the correct standard. Yes, if you look at, I believe it's at ER 10. So at ER 8 is the page of the decision in which the court recites the arguments as to impact made by the tribe and actually cites to the tribe's brief. There's then some discussion and then on ER 10, the court states its conclusion that as a matter of law, that Electron has caused take by impairing safe fish passage. And it is that which we say the judge, that's where he made the mistake. Despite having other places where he cites the correct standard? He references, well for example, he references the National Marine Fishery Service, a portion of the Federal Register notice for when it defined harm. But as we pointed out, he misses the relevant piece of that Federal Register notice where the service explained that the impediment to upstream migration, the impediment to fish passage, has to actually be linked to some actual injury to the fish. Injury or death to the fish, which could be, for example, actually preventing them from spawning. Thank you. Thank you. We'll now hear from Ms. Brimmer. Thank you, Your Honor. My name is Brimmer. I'm going to start with what Mr. Brandt-Erikson was talking about with respect to the remedy. Mr. Brandt-Erikson, in presenting his remedy argument to you, moves pretty quickly past the merits. And that's an important part of determining either whether a stay of the remedy is appropriate here or whether the remedy itself was an abuse of discretion by the district court. And in fact, the merits are critical because the defendants here cannot succeed in the case of a case. The court applied the correct legal standard and did not impermissibly weigh evidence or judge credibility. But even more importantly, the district court was very careful in the remedy here. The district court clearly remedied the take that the court had found, and it has an obligation under the case law to do so. The court also narrowly tailored that. Mr. Brandt-Erikson, Mr. Brandt-Erikson presents to you the cofferdam alternative. That was their preferred alternative. Now, that was their preferred alternative because they wanted to protect their structures, and yet they now recognize that the stipulated order will protect their structures, that that is no longer a concern. Nonetheless, the remedy that Mr. Brandt-Erikson argues for was appropriately rejected by the district court. It involves building an even larger cofferdam than they built in the past. And that's a problem that we have now that needs to be addressed. The cofferdam that they built in 2021, it adds significant gravel, rock, sand, other material to the river itself. That will go in the middle of the river in order to redirect flows. It will involve the use of heavy equipment. And the court properly recognized that that very thing failed in 2021 when they did it. It failed a year later. And it directed flows back over the rock dam creating the exact problem that we have now that leads to take. So I just wanted to be clear that in the case of the this instance, there is nothing wrong with the remedy. And the court properly tailored it and was very, very careful in its consideration, having separate briefing, having a separate hearing on that. The court even went out to the site and viewed it before issuing the remedy. Can you help me on the on the disputed issue? Because the district court said there was no dispute, but we seem to have two experts who have different perspectives on this. Thank you, Your Honor, because I think you're right that the merits of this case really is where the meat of this is and what needs to be decided here. And that's really about I'm going to address first the summary judgment issue and whether or not this is proper for summary judgment. And then I will turn to the application of the ESA standard here on summary judgment. First of all, I was surprised to hear Mr. Brandt Erickson say that now he wants a jury. This decision was issued a scant two months before we were supposed to go to trial and we had not heard anything about a jury to him. He was simply correcting me about when I asked if this was an appropriate kind or package of issues to be resolved by a lay jury. And he reminded me that right now it's a bench trial. Yes, Your Honor. And anyone who has practiced in federal court for any length of time knows that if you don't make that demand early on, you're probably in trouble. So go ahead. Sure. The Puyallup tribe obviously carries the burden initially here in making the motion for summary judgment. But once the tribe carries that burden, it is up to Electron to demonstrate evidence that raises a genuine issue of material fact. And then the court applies the law to that evidence. Now here, Electron did not introduce evidence that raises a genuine issue of material fact. And importantly, the court did not weigh credibility and evidence. First, the Puyallup River is occupied by three listed species. There's no dispute about that. There's no dispute about historically those species occupied places above the dam. In fact, sometimes they still are found above the dam. No one is arguing that the dam blocks all fish all the time. The Electron Dam, the problem here is not the dam in the entirety. What we're arguing about here is a section of the dam that was installed by Electron after the artificial turf blowout – the issue that led to Clean Water Act violations. So here we're referring it to the rock dam. It is a sheet metal pile wall. It is this huge wall installed vertically in the river with non-native boulders spread below that on a fairly steep slope. That is what is causing the false attraction flow. And that is the issue here. And that is what the judge has asked to be removed, not the entirety. That sheet pile wall and the flow coming over that is on the opposite side of the river from the fish ladder. And while indeed the tribe's experts designed that fish ladder, they did so being forced to put it on the side of the river where they said it would not be best. And that ladder was designed before this rock dam was installed. So who designed the ladder is really immaterial here. So let's talk about what the court did in terms of the facts and what the court accepted. The court accepted all the evidence here as true. It did not judge and discard evidence. It did not weigh credibility. And the court was very clear about that. But the evidence as a whole, including all of the evidence offered by Electron, did not give rise to a genuine issue of material fact that fish are being harmed in their migration. And they are being harmed in their ability to reach breeding habitat in this case. And that meets the definition that this court has set forth. So I don't think Dr. Barrett agrees with that. I mean, he and so and he has reasons for that, including inspections and other things that he did, other theories for that. Absolutely, Your Honor. I know that, excuse me, Dr. Barrett did not agree with that conclusion, the legal conclusion. But let's look at what Dr. Barrett did agree to. In sworn testimony, Dr. Barrett agreed that the rock dam is creating a false attraction flow away from the fish ladder. In deposition testimony, Dr. Barrett agreed with all of the statements made in the tribe's expert's report of Russell Ladley. He is a fisheries biologist with 30 years of experience, both for the tribe and on this river. And Dr. Barrett said, I can't think of anything that I disagree with in Russ Ladley's expert report. That was in his sworn deposition. Doesn't he, didn't Dr. Barrett disagree as to whether, with respect to these false attraction flows, whether it would actually impact the migration? What Dr. Barrett said in his declaration on the summary judgment, not in his earlier deposition, is that fish may be able to get over the rock dam side, sometimes at very high flows. That does not alleviate a take. The court was able to accept that testimony and say, all right, maybe fish make it over some of the time. That does not mean that fish aren't blocked by that. It does not mean that juveniles aren't harmed when they fall over the sheet pile into the boulders. That is a fact that Dr. Barrett never, never questioned. It doesn't alleviate the fact that the fish ladder is often inoperable at lower flows. Often that occurs in the month of October, which is prime Chinook spawning and migration season. So again, these are important details that Dr. Barrett did not contest. And the court accepted that maybe the rock dam was passable sometimes. Electron. Oh, I also want to make a note that when Mr. Brant Erickson talks about the fact that when the fish ladder is impassable, and it is impassable for weeks at a time, the evidence is undisputed on that. And often, as I said, during prime migration season, when flows are lower, there is no evidence in the record that that mimics the rest of the river. Mr. Brant Erickson has said to you here today, well, that's not any different than what fish have to struggle through the rest of the time. There's no evidence of that. In fact, this is an artificial construction in the river. It does have an impact on a fish that is not like the natural river. And I just want to make note that there's nothing about that in the record. I also want to talk about the fact that I think Judge Bress pointed out that there is also some testimony from Dr. Barrett about observations he made. And I think that that is important to note that, again, the district court accepted that. Dr. Barrett testified that he went to the fish ladder for about an hour on one day in October of 2023, which, you know, four or five months before the motions. And he observed seven fish in the ladder that day. The court absolutely accepted that testimony. The court also, however, had already accepted all of the testimony of the tribe, who again has the burden here, that there were 5,800 GoPro photographs of the fish ladder for the entire month of October 2023. And the fisheries biologists for the tribe reviewed each and every one of those 5,800 photographs. And not one of them showed fish in the ladder during prime Chinook migration season. In fact, not one of the 200 photos during the day that Dr. Barrett was there showed fish. Now, that isn't a disputed fact. That's a group of facts that show that there's evidence that seven fish made it up the ladder in October of 2023. There is also evidence that for 5,800 photos taken at minutes long intervals, there were no fish. That is evidence that the court could accept that most fish are not making it through the ladder. And that is exactly what the tribe's experts have testified to. Right, but isn't there a question still as to why that is? Your Honor, the tribe's experts carried their burden and said the reason why is because there are false attraction flows attracting fish away from the ladder. Salmonids are reotactical, and that's something that means that they follow the flow. They are genetically programmed to point their nose to where the primary flow is coming from and go in that direction. That's why the tribe didn't want to build the ladder on the side of the river. It did – the primary flow was on the side where the rock dam is. So when they built the rock dam, it started to cause the primary flow to come over the rock dam, and it causes a signal to the salmon that, hey, that's the way to go. Instead of taking a sharp left turn – if you look at the photographs that are in the record, you can see how this is set up – sharp left turn in a lower flow situation, almost slack water at times, to try to get to the far side of the river to where the ladder is. The tribe's experts were very clear that that is a false attraction flow that is, all experts agree, is harm to fish. They are going to be attracted to that side of the river, which is impassable. They can't jump up over the vertical sheet pile wall, except, as Dr. Barrett speculates, in very high flows. They get trapped in the boulders. There's expert testimony about that. They can exhaust themselves. They can be late getting to their breeding ground. So even if they make it over, they may not make it to the tributaries that have the prime habitat, which is where they would have successful breeding. If they breed in less successful places, their eggs will be washed out, their eggs will be buried, they will be more prone to predation. The fish can injure themselves on the boulders. Again, they might still make it upstream, but they are now injured, and they are not going to be as successful at breeding. They may expire before they can get to the breeding place. And there's nothing in Dr. Barrett's testimony that addresses juveniles being harmed with respect to dropping over the dam, except the informal surveys that he tried to have his staff do in the spring of the year, and they said they found no dead juveniles. Court accepted that, but the court also accepted the testimony of multiple experts from the tribe that explained why you would not find dead juveniles, that that is not really a thing that is going to produce the evidence that Electron wants to produce. Juveniles are extraordinarily small, so they're hard to find in the first instance. They may just float to the bottom and be trapped in the boulder dam. They may wash downstream, which Dr. Barrett acknowledged that. He said in certain conditions, those fish could very well have washed downstream. Can I ask you a procedural question?  It's the tribe that moved for partial summary judgment, is that right? Correct. That's correct. Did the tribe independent of that also move for an injunction? Yes. So do you see those as inextricably linked, or are they independent? I think that they are, can I say both? What I would argue is that the tribe moving for summary judgment on the merits produces the finding and the ruling that there is an illegal take under the Endangered Species Act. At that point in time, the district court does have an obligation to remedy that take. So in that respect, they are inextricably linked. What the district court orders, though, to address that take is subject to some discretion. And so there is some independence with respect to what is in the injunctive relief. But I do believe that once that take is found, there is an obligation under the case law for the court to address that take. So in hearing that answer, I guess I interpret that to mean that there's not really a preliminary injunction request unhinged from a determination on the merits, as opposed to in a typical injunction, we'd be looking at the likelihood of success on the merits and then all of the other. And to be clear, Your Honor, let me tell the court how this then played out. This was partial summary judgment, so there would have been additional issues perhaps for trial at that time. So it was appropriate for the tribe to capture this as a preliminary injunction. The net result was that this actually became the ultimate relief in the case because the court disposed of some of the other issues that the tribe had raised as premature and not yet ripe, and the tribe did not contest that. And then I think there was perhaps one issue remaining that the tribe and the defendants decided would not be pursued. If the tribe had lost at partial summary judgment, then it wouldn't have had a freestanding motion for preliminary injunction remaining, is that right? That is correct. All right, thank you. Yes, that is correct. I'd like to turn, barring any additional questions with respect to the facts and the fact that there was really no genuine issue, as I've said. The court didn't weigh credibility. The court took all the facts under advisement. The tribe carried its burden of showing harm through experts, just like in the Murillet series of cases, in fact, the one that was discussed, the Cascadia Wildlands case that was decided recently. Same thing. Fish are in the river. There's expert testimony connecting harm to the fish from the Electron Dam. There's expert testimony describing how that harm happens. Dr. Barrett's position that there's not evidence of dead or injured fish. I grant your point that that's not a strict requirement, but I think the argument is we can at least draw something from that and someone could infer from that that maybe the situation is not as bad as your clients say. Your Honor, someone could if the tribe had not already carried the burden in that regard. And what I am noting for the court is that, first, Dr. Barrett admits that his surveys for dead and injured fish were only for juveniles. So there was no survey or any attempt for Dr. Barrett to look at whether there were dead and injured fish that were adults. But I think he's also saying there's an absence of evidence on your client's part about that, too. But my clients carried their burden of showing why that would be an impossibility for the most part. That, in fact, in this instance, when you have this kind of harm, the tribe's fisheries biologists, again, collectively with over 40 years of experience between them on this river and as to fisheries biology in general, address that very fact. And they gave multiple reasons why dead and injured fish in a situation like this are not going to be observable and are not going to be present. And if you even see one dead or injured fish, that that would be unusual. And they said it's because dead fish sink to the bottom. They're carried away. They are predated very quickly. Eagles, osprey, mink, otter, bears are all in this region. Again, Dr. Barrett acknowledged that because when he designed the study for juveniles, he instructed the person doing the study to go out very, very early in the morning – basically at or before sunrise – because otherwise they are going to miss any fish that would be predated. And, in fact, the testimony – sworn testimony of the person doing those surveys is she never went out then. She always went out later in the morning. So, again, the tribe carried its burden of showing all of the ways that expert biologists assess harm in this situation. And they draw conclusions of harm, and they explain that to the court. And their testimony concerning why you would not find dead and injured fish was unrebutted by Electron. They were not able to explain why they thought that dead and injured fish would be present in this situation. And so, again, they did not carry their burden of raising the genuine issue of material fact after the tribe carried its. Turning to the standard, the ESA standard, as Judge McEwen has pointed out in her questions to my opponent, the judge did, in this case, the district court did, correctly state the standard – stated the Endangered Species Act standard, cited and quoted to the regulatory language with respect to what constitutes harm or injury or harassment to fish. And then the judge set forth all of the facts that I've been discussing today, accepted all of those facts as true, applied that standard to that evidence, and said, I find that there is a Section 9 take here. And, again, the judge did that in a way that comports with this court's recent case law. And case law going back, the judge noted there are fish in the river that are listed. I want to ask maybe one last question on my part anyway. If we were to determine that there was a factual issue, where would the case go then procedurally in your view? My understanding is if this court were to determine that there is a genuine issue of material fact, it would be remanded for trial to the court to Judge Kuhnhauer and that the judge would set this matter for trial. That's my understanding. And I see that my time is up, so barring any further questions, thank you. Thank you. Your Honors, I want to start just briefly on material issues of fact. Dr. Barrett explained that the tribe's experts, the tribe's biologists, have presented what amounts to a hypothetical based upon their understanding of the standard behavior of fish and their concerns about this structure. And as he explained, they expressed some of those concerns in 2021 when it was being, the authorization to 2020 and 2021 when the authorization to put the structure was made and then when plans to address fish passage were implemented in 2021. Between 2021 and 2023, he engaged in several different kinds of data collection. And he explained in his declaration how the various types of information, actual extrinsic evidence responded to that hypothetical and that's why there are material issues of fact. And we also pointed to where he explained what would happen. Walk through the data collection then. What are the forms of data that he collected that, in your view, rebut the tribe's position? All right. He had a person go out and do observations for a couple of months on a regular basis in the morning to see what she found. She actually saw some live fish, live juvenile fish off on the side of the river. Saw no dead or injured fish. There is a requirement that there be monthly or weekly surveys done of the fish ladder. That was required on an ongoing basis. Not only do we have the observations that were made of the fish ladder, but the folks who did that work did informal surveys looking down the river to see if they saw anything. Then he also went out to the river. And then also the person who was assigned to collecting water quality data went out and as part of what he was doing went and made observations of the spillway. So those were, you know, it's not a formal survey, but a wide variety of information that he collected and which formed the basis for his opinions. So that's sort of opinions about data collection, but are there also opinions that are essentially theoretical or modeling opinions relating to how this whole structure works together? So out of that information, he concluded that, and in observations of the spillway, that the first, that fish are not being injured by their interaction with the spillway, and two, that while fish could be distracted by it, they would still find their way over to the fish ladder and in fact were finding their way through the fish ladder. I also would point out the fish. Meaning the fish, but how many fish? Well, there's no fish counter. Right. But I also would point out that the court did not, that the district court did not find that the fish ladder is not functional. There's nothing in the district court's order finding any problem with the fish ladder. I have used up my time. So I'll stop unless you have any other questions. Hearing none, I want to thank you. Thank you both for your helpful briefing and argument. This matter is submitted and will be adjourned for the day, and the court will stand in recess until tomorrow. All rise.
judges: HAWKINS, McKEOWN, BRESS